Brittany Thorpe
Wyo Bar No. 7-6490
Domonkos & Thorpe, LLC
1914 Logan Ave.
Cheyenne, WY 82001
(307) 426-5015
Brittany@dandt.llc

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2023 JUL -3 PM 2: 33

MARGARET BOTKINS, CLERK
CHEYENNE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| FRIENDS OF ANIMALS, a 501(c)(3) organization, | |
| Plaintiff, | Civil Action No. 23CV-117-F |
| vs. | |
| DEB HAALAND, in her official capacity as the Secretary of the Department of the Interior, | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| | **(REVIEW OF FINAL AGENCY ACTION UNDER THE ADMINISTRATIVE PROCEDURE ACT)** |
| THE UNITED STATES BUREAU OF LAND MANAGEMENT, a federal agency, | |
| Defendants. | |

### INTRODUCTION

1.      Wild horses are a vital part of Wyoming's environment, history, and

economy. Recognizing wild horses as "living symbols of the historic pioneer spirit of the

West that contribute to the diversity of life forms and enrich the lives of the American

people," Congress passed the Wild Free-Roaming Horses and Burros Act in 1971 and

mandated that wild horses be protected and considered "an integral part of the natural

system of public lands." 16 U.S.C. § 1331. Almost a century before that, in 1885, Congress enacted the Unlawful Inclosures Act to prohibit private and state landowners from restricting access to federal public lands.

2.       The United States Bureau of Land Management disregarded congressional direction and mandates when it called for the elimination of wild horses from over one million acres of federal public lands in southwestern Wyoming in an attempt to appease a private grazing association and reduce management difficulties arising from private landowners.

3.       Plaintiff Friends of Animals brings this action against Defendants, the United States Bureau of Land Management (BLM), and Deb Haaland, the Secretary of the Department of the Interior to challenge BLM's wild horse Resource Management Plan (RMP) amendment to the 1997 Green River and 2008 Rawlins RMP and the associated Record of Decision (ROD) and Environmental Impact Statement (EIS) (collectively, the "Decision").

4.       BLM's Decision calls for the eradication of protected wild horses from over a million acres of federal public lands in southwestern Wyoming. This includes eliminating wild horses from the Salt Wells Creek and Great Divide Basin Herd Management Areas (HMAs), and significantly reducing the population of wild horses on public land in the Adobe Town HMA. This vast area is home to the largest wild and free-roaming horse herds left in Wyoming. These wild horses are a vital part of the natural environment and attract admirers from around the nation and the world.

5.       In approving the Decision, BLM gave little to no attention to how the RMP Amendment will impact the environment or threaten the health and viability of wild horse

populations in southwest Wyoming. Nor did BLM consider reasonable alternatives that could alleviate management difficulties and protect wild horses. Instead, the agency sought to appease the interests of a private corporation, the Rock Springs Grazing Association (RSGA). RSGA owns and leases private property abutting BLM's land in an area where private and state land are interspersed with federal public lands, commonly referred to as the "Checkerboard." The RSGA uses public lands to graze cattle and sheep at extremely reduced rates and demanded that wild horses be removed from the Checkerboard.

6.      This is not the first time BLM has allowed private interests to dictate how BLM manages the public lands over which it maintains authority, caving particularly to the private interests of RSGA. RSGA has successfully lobbied and pressured BLM on multiple occasions to reduce the population of wild horses in this region through removal from not just privately owned lands, but the public lands over which BLM has authority and in which the wild horses enjoy federal protection.

7.      However, such action conflicts with the Wild Free-Roaming Horses and Burros Act (WHBA or Act). The WHBA directs how BLM should protect and manage wild horses on public lands, and what BLM may do if wild horses stray onto private lands. Section 3 of the Act mandates that BLM "protect and manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving, natural ecological balance on the public lands." 16 U.S.C. § 1333(a). Section 4 of the Act authorizes private landowners to maintain wild horses on their land if they are protected from harassment or to request that they be removed from the private land, in which case they should be removed from just private land.

8.      Thus, the Tenth Circuit Court of Appeals rejected BLM's previous efforts to remove wild horses from public lands based on private interests or management difficulties. *Am. Wild Horse Preservation Campaign v. Jewell*, 847 F.3d 1174 (10th Cir. 2016). The Tenth Circuit held that despite the complicated "Checkerboard" land ownership configuration of the region, there is "no basis for BLM to construe the terms 'privately owned land' and 'private lands' to include the public land section." *Id.* at 1188. Nothing in the WHBA allows BLM to respond to removal requests from private landowners by removing wild horses from public lands and "treating public lands as private lands." *Id.*

9.      Here, the RMP Amendment only covers BLM administered public lands. BLM is ignoring the WHBA and Tenth Circuit precedent by issuing the Decision and managing public lands for the benefit of the nearby landowners and their private interests, and acting, without authority, to eradicate federally protected wild horses from public lands.

10.     BLM does not hide from this fact. BLM admits in the Decision that there exists sufficient forage, water, cover, and space for the wild horse populations in the HMAs.

11.     Despite this, BLM chose to remove wild horses from public lands to satisfy the RSGA and to reduce the purported administrative difficulty in protecting wild horse populations within the "Checkerboard" land configuration.

12.     For these reasons, and as further alleged below, Friends of Animals seeks a declaration from the Court that Defendants violated the WHBA, and the National Environmental Protection Act (NEPA). Friends of Animals further requests that the Court vacate the Decision, including the RMP Amendment, and enjoin the removal of wild horses from in and around the Adobe Town, Salt Wells Creek, White Mountain, and Great Divide Basin HMAs.

4

## PARTIES

13.     Friends of Animals is a nonprofit, international animal advocacy organization, incorporated in the state of New York since 1957. Friends of Animals has nearly 200,000 members worldwide, including members in the State of Wyoming. Friends of Animals and its members seek to free animals from cruelty and exploitation around the world, and to promote a respectful view of nonhuman, free-living and domestic animals. Friends of Animals informs its members about animal advocacy issues and its progress in addressing them through its magazine, *ActionLine*, its website, social media, and public events. Friends of Animals regularly advocates for the right of wild horses and burros to live freely on public lands, and for more transparency and accountability in BLM's "management" of wild horses and burros.

14.     Friends of Animals and its members have significant interests in the wild horses residing in the areas managed by the Rock Springs and Rawlins BLM Field Offices. Friends of Animals staff and members have professional and recreational interests in observing, studying, and photographing wild horses in the Salt Wells Creek, Great Divide Basin, Adobe Town, and White Mountain HMAs. Those interests which will be significantly injured by the actions authorized in the Decision. Friends of Animals' injuries are traceable to Defendants' conduct and are redressable by the Court through the relief Friends of Animals seeks.

15.     Defendant BLM is an agency within the Department of the Interior. BLM is responsible for ensuring federal actions comply with applicable federal laws. BLM administers over 245 million acres of public lands across the United States, mostly found in twelve western states, including Wyoming. The Rock Springs and Rawlins Field Offices

5

operate as part of BLM and are under the authority of BLM. The Great Divide Basin, Adobe

Town, Salt Wells Creek, and White Mountain HMAs are all located on public lands

administered by BLM.

16.     Defendant Deb Haaland is the Secretary of the Department of the Interior, the

federal agency that oversees the BLM. Defendant Haaland is responsible for ensuring that

BLM's actions comply with the requirements of all federal laws.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331

(federal question). This action presents a case and controversy arising under the WHBA,

and NEPA, and is brought through the Administrative Procedures Act (APA). This Court

also has jurisdiction pursuant to 28 U.S.C. § 1346 because a federal agency is a defendant.

The relief sought is authorized by 28 U.S.C. § 2201 (declaratory judgment) and 28 U.S.C. §

2202 (injunctive relief).

18.     Venue properly lies in this Court pursuant to 28 U.S.C. § 1391. A substantial

part of the events giving rise to these claims occurred in this judicial district, as the

challenged Decision was issued by BLM's Rock Springs Field Office, located in Rock Springs,

Wyoming, and by BLM's Rawlins Field Office, located in Rawlins, Wyoming.

## LEGAL AUTHORITY

### A. The Wild Free-Roaming Horses and Burros Act

19.     In 1971, Congress passed the Wild Free-Roaming Horses and Burros Act

(WHBA), 16 U.S.C. §§ 1331, *et seq.*, finding that "wild free-roaming horses and burros are

living symbols of the historic and pioneer spirit of the West; that they contribute to the

diversity of life forms within the Nation and enrich the lives of the American people; and

6

that these horses and burros are fast disappearing from the American scene." Upon finding

this, Congress stated its policy was that "wild free-roaming horses and burros shall be

protected from capture, branding, harassment, or death, and to accomplish this they are to

be considered in the area where presently found as an integral part of the natural system of

public lands." 16 U.S.C. § 1331.

20.     The WHBA includes separate provisions that direct how BLM must manage

wild horses on public lands and how BLM should respond to concerns about wild horses on

private lands.

### 1.  Protection of wild horses on public lands

21.     In regard to public lands, the WHBA requires BLM to "protect and manage

wild free-roaming horses and burros as components of the public lands . . . in a manner that

is designed to achieve and maintain a thriving, natural ecological balance on the public

lands." 16 U.S.C. § 1333(a).

22.     The WHBA requires management of wild horses and burros on public lands

to be at "the minimal feasible level." *Id.*

23.     The objectives of the WHBA implementing regulations are also to manage

wild horses "as an integral part of the natural system of the public lands;" and to protect

wild horses from "from unauthorized capture, branding, harassment or death." 43 C.F.R. §

4700.0-2.

24.     BLM must manage wild horses and burros as self-sustaining populations of

healthy animals in balance with other uses and the productive capacity of their habitat. 43

C.F.R. § 4700.0-6(a).

25.     The regulations further require that "[m]anagement activities affecting wild horses and burros shall be undertaken with the goal of maintaining free-roaming behavior." 43 C.F.R. § 4700.0-6(c).

26.     BLM must consider wild horses "comparably with other resource values in the formulation of land use plans." 43 C.F.R. § 4700.0-6(b).

27.     The WHBA only authorizes the removal of wild horses from public lands in limited circumstances.

28.     Before removing wild horses from public lands, the WHBA requires BLM to determine both that (1) "an overpopulation [of wild horses and burros] exists on a given area of the public lands," and (2) "action is necessary to remove excess animals." 16 U.S.C. § 1333(b)(2).

29.     The WHBA defines the term "excess" as animals that "must be removed from an area in order to preserve and maintain a thriving ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

30.     The WHBA does not authorize BLM to remove non-excess wild horses.

31.     The WHBA does not authorize BLM to manage for zero wild horses on public lands where wild horses were found at the time of the passage of the WHBA and removal is not necessary to achieve a thriving natural ecological balance.

32.     BLM's regulations do authorize the closure of public lands to grazing by domesticated cattle and sheep "if necessary to provide habitat for wild horses or burros, to implement herd management actions, or to protect wild horses or burros from disease, harassment or injury." 43 C.F.R. § 4710.5; 43 C.F.R. § 4710.6.

8

## 2. Management of wild horses that roam across private lands

33.     The WHBA has a separate section directing how BLM should manage wild horses that have strayed onto private lands.

34.     The WHBA authorizes BLM to remove wild horses from private lands, when the owners of such land request removal and inform the nearest Federal Marshal or BLM agent. 16 U.S.C. § 1334.

35.     The WHBA does not mandate that removal happen within a specific time period.

36.     The WHBA also provides that a private landowner may maintain wild horses on their private lands, or lands leased from the Government, if they do so "in a manner that protects them from harassment, and if the animals were not willfully removed or enticed from the public lands." 16 U.S.C. § 1334.

37.     BLM's authority to remove horses that have strayed onto private lands does not supersede its duty and obligation to protect wild horses and manage them as self-sustaining populations on public lands.

38.     The WHBA does not authorize BLM to manage or remove wild horses on public lands to prevent these animals from straying onto private lands.

39.     BLM does not have authority under the WHBA to remove wild horses from public lands to promote the interests of private landowners and livestock grazing on private or public lands.

40.     BLM does not have authority to remove wild horse populations to promote administrative convenience.

9

### B. The National Environmental Policy Act

41.     The National Environmental Policy Act (NEPA) is our nation's basic charter for environmental protection.

42.     Congress enacted NEPA for two main purposes. First, Congress sought to mandate that federal agencies examine the environmental impacts of their actions before acting. Second, Congress sought to provide a statutory means to be informed about, and to comment on the environmental impacts of proposed agency actions.

43.     NEPA requires federal agencies to analyze the environmental impact of a particular federal action before proceeding with that action. *See* 42 U.S.C. § 4332(2)(C).

44.     Accordingly, before a federal agency can act in a way that significantly affects the quality of the human environment, NEPA requires the acting agency to prepare a detailed Environmental Impact Statement (EIS) that discusses all potential environmental impacts of the proposed actions, including: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).

45.     The EIS is the cornerstone of NEPA. An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The requirement to prepare an EIS is broad and intended to compel agencies to seriously consider all potential environmental consequences of proposed agency action.

46.     The acting agency must adequately evaluate all potential environmental impacts of the proposed action. *See* 42 U.S.C. § 4332(2)(C). To meet this obligation, the federal agency must identify and disclose to the public all foreseeable impacts of the

proposed action and alternatives, including direct, indirect, and cumulative impacts. *See id.* § 4332(2); *see also* 40 C.F.R. § 1502.16, § 1508.7-1508.8.[1]

47.     Under NEPA, the acting agency must consider reasonable alternatives to the proposed action based upon information obtained and analysis presented related to the affected environment and the environmental consequences. 40 C.F.R. §§ 1502.14-16. An agency must "rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a).

48.     The agency's analysis must "[i]nclude appropriate mitigation measures not already included in the proposed action or alternatives," and a discussion of the "means to mitigate adverse environmental impacts." 40 C.F.R. § 1502.14(f); 40 C.F.R. § 1502.16(f).

49.     Agencies should also consider the effects of connected actions that are closely related to the proposed action and which should be discussed in the same document as the proposed action. 40 C.F.R. § 1508.25. Actions are connected if they: "(i) automatically trigger other actions which may require environmental impact statements; (ii) cannot or will not proceed unless other actions are taken previously or simultaneously;

---

[1] The NEPA analysis challenged here began at the time the EIS notice of intent was published in the Federal Register, and thus, the regulations in effect at that time apply to this case. *See* Final Environmental Impact Statement at 1; Notice of Intent To Prepare a Resource Management Plan for the Rock Springs Field Office, Wyoming and Associated Environmental Impact Statement and Call for Coal Information, 76 Fed. Reg. 5607 (Feb. 1, 2011). Therefore, the citations in this complaint reference the regulations that apply to the challenged Decision here, previously codified at 40 C.F.R. Parts 1500-1508.

Subsequent Amendments issued in 2020 and 2022, do not apply to this case. *See* 40 C.F.R. § 1506.13 (amendments "apply to any NEPA process begun after September 14, 2020."); 87 Fed. Reg. 23453 (April 20, 2022) (Regulation revisions effective May 20, 2022).

or (iii) are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a).

### C. The Administrative Procedure Act

50.     The Administrative Procedure Act (APA) governs the internal procedures of administrative agencies, including how they interact with the public.

51.     Under the APA, the reviewing court must hold unlawful and set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A).

52.     Under the APA, the reviewing court must also hold unlawful and set aside agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

## FACTUAL ALLEGATIONS

### A. Herd Management Areas Managed by the Rawlins and Rock Springs Field Office and Planning Area for Wild Horse RMP Amendment

53.     The Rawlins and Rock Springs BLM Field Offices manage the Adobe Town, Great Divide Basin, Salt Wells Creek, and White Mountain HMAs, areas established for the protection of wild horses. While each field office is responsible for managing federal public lands, there are alternating sections of private or state-owned lands interspersed with federal lands forming a "checkerboard" pattern (the "Checkerboard"). The "planning area" referenced in the EIS is broader than the lands covered by the RMP Amendment and also includes the surrounding area, encompassing approximately 2,811,401 acres, including 1,920,314 acres of surface estate managed by BLM and 814,086 acres of private land. Below is BLM's map of the planning area.



Figure 1: Planning Area Map from BLM's Record of Decision

54.     The Checkerboard land ownership pattern is the result of agreements between the federal government and the Union-Pacific Railroad Company under the Union Pacific Act passed in 1862. The Railroad Company was awarded odd-numbered lots of public land along the railroad right-of-way extending twenty miles out from each side of the railbed as construction of each mile of railroad was completed, creating alternating land interests and the checkerboard configuration.

55.     In response to conflicts that arose out of this land pattern, Congress enacted he Unlawful Inclosures Act of 1885 to prevent public lands from being unlawfully enclosed "by any person, party, association, or corporation." 23 Stat. 321; *see also* 43 U.S.C. § 1062-1063.

56.     The Unlawful Inclosures Act prohibits private individuals and entities from preventing or obstructing the "free passage or transit over or through the public lands" through the use of "force, threats, intimidation, [] fencing or inclosing, or any other unlawful means." *Id.*

57.     The prohibitions of the Unlawful Inclosures Act ensure not only the rights of people to have free access to public lands, but also grant wild animals unrestricted access over and through public lands. *See United States ex rel. v. Bergen v. Lawrence*, 848 F.2d 1502 (10th Cir. 1988). Even if a private landowner holds grazing permits on public land, such land cannot be enclosed to prevent animals from grazing and foraging on the same public lands. *Id.* at 1510. It is not the "fence itself" that determines whether there is a violation of the Unlawful Inclosures Act, but whether access to public lands is restricted. *Id.* at 1511 (citing *Bergen v. Lawrence*, 620 F.Supp. 1414, 1419 (D. Wyo. 1985)).

14

58.     In 1971, when Congress passed the WHBA to protect wild horses, wild horses were present in the areas now designated as the Adobe Town, Great Divide Basin, Salt Wells Creek, and White Mountain HMAs.

59.     Wild horses in the planning area are managed under the 1997 Green River RMP and the 2008 Rawlins RMP. Under these RMPs, BLM established that the total Appropriate Management Level (AML) of wild horses for all HMAs in the region was between 1,481 and 2,065 wild horses.

60.     The Adobe Town, Salt Wells Creek, Great Divide Basin, and White Mountain HMAs were originally comprised of approximately 70% public land and approximately 30% private land, including parcels of public and private land within the Checkerboard.

61.     BLM manages 1,920,314 acres of public land between the four HMAs in the region, including public land in the Checkerboard.

62.     Private lands in the planning area total only 814,086 acres.

63.     The remaining acreage in the planning area includes land owned by local governments and the State of Wyoming.

64.     The Checkerboard land area includes the Rock Springs District, an area of private ownership managed by the RSGA, which uses the public and private land in the Checkerboard primarily for livestock grazing. The RSGA owns a significant percentage of the private lands within the Checkerboard: 93% of the private land in the Adobe Town HMA, 50% of the private land in the Great Divide Basin HMA, 40% of the private land in the Salt Wells Creek HMA, and 82% of the private land in the White Mountain HMA.

65.     There is sufficient forage, water, cover, and space in the BLM public land portions of the Adobe Town, Great Divide Basin, Salt Wells Creek, and White Mountain HMAs to sustain wild horse populations in a thriving natural ecological balance.

66.     The Adobe Town HMA can sustain the AML of 610-800 wild horses that BLM previously set.

67.     The Great Divide Basin HMA can sustain the AML of 415-600 wild horses that BLM previously set.

68.     The Salt Wells Creek HMA can sustain the AML of 251-365 wild horses that BLM previously set.

69.     The White Mountain HMA can sustain the AML of 251-365 wild horses that BLM previously set.

70.     BLM does not need to manage for zero wild horses or reduce AMLs in the Adobe Town, Great Divide Basin, Salt Wells Creek, and White Mountain HMAs in order to achieve a thriving natural ecological balance on public lands.

**B. Rock Springs Grazing Association and the 2013 Consent Decree**

71.     RSGA is a private grazing corporation that owns and leases private land in the Checkerboard for livestock grazing purposes.

72.     BLM currently authorizes RSGA to use public lands in the Checkerboard to graze private cattle and sheep at rate $1.35 per animal unit month (AUM).

73.     An AUM is a month's use and occupancy of range by one cow, bull, steer, heifer, horse, burro, mule, 5 sheep, or 5 goats over the age of 6 months.

74.     The federal grazing fee is significantly lower than grazing on other lands. In 2022, the average fee for grazing cattle on state land in the West was $23.90 per AUM.

75.     RSGA has continually opposed wild horses on both public and private land in the Checkerboard, which it views as competitors with livestock for forage.

76.     In 1977, RSGA formally requested removal of wild horses from private lands in the Checkerboard.

77.     In 1979, RSGA entered into an agreement with wild horse advocacy groups in which RSGA would "tolerate" the presence of 500 wild horses in the Checkerboard region of the HMAs.

78.     In 2010, RSGA revoked its consent to tolerate 500 federally protected wild horses on private lands in the Checkerboard. It demanded the removal of all wild horses and met with then-Deputy Assistant Secretary of the Interior Sylvia Baca.

79.     Attributing the number of wild horses to a lack of funding from Congress, Baca informed RGSA "that litigation would be necessary to secure additional funding for wild horse gathers," evidencing, as the Atlantic characterized it, "an appalling lack of neutrality." Andrew Cohen, *On Wyoming's Range, Water is Scarce but Welfare is Plenty*, The Atlantic, July 9, 2012 (accessed at https://www.theatlantic.com/nationa/archive/2012/07/on-wyomings-range-water-is-scarce-but-welfare-is-plenty/259538/).

80.     In June 2011, RSGA filed a lawsuit against BLM, alleging the agency failed to remove wild horses from private lands located in the Checkerboard configuration. *See Rock Springs Grazing Association v. Salazar*, 935 F. Supp. 2d 1179 (D. Wyo. 2013).

81.     In 2013, BLM reached a settlement with RSGA and agreed to a Consent Decree as part of a Joint Stipulation for Dismissal resolving the litigation with RSGA.

Consent Decree, *Rock Springs Grazing Association v. Salazar*, 935 F. Supp. 2d 1179 (D. Wyo. 2013) (No. 2:11-cv-263) ("2013 Consent Decree").

82.     Under the 2013 Consent Decree, BLM agreed to consider changing the Salt Wells Creek HMA to a Herd Area (HA) managed for zero horses, changing the Great Divide Basin HMA to an HA managed for zero horses, reducing the AML of the Adobe Town HMA, and managing the White Mountain HMA as a non-reproducing herd through the use of fertility control and sterilization methods.

83.     The 2013 Consent Decree does not relieve BLM of its obligations and duties under the WHBA and NEPA.

84.     The 2013 Consent Decree stated that

> Nothing in this Consent Decree shall be construed to limit or modify the discretion accorded to BLM by the applicable federal law and regulations, including but not limited to the WHA; the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. §§ 1701 et seq.; the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq.; the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 et seq.; or general principles of administrative law with respect to the procedures to be followed in carrying out any of the activities required herein, or as to the implementation or conduct of any of the activities required herein.

2013 Consent Decree, ¶10.

85.     Similarly, the 2013 Consent Decree stated that "[n]o provision of this Consent Decree shall be interpreted or constitute a commitment or requirement that the Respondents take actions in contravention of the WHA, FLPMA, NEPA, the APA, the Endangered Species Act, or any other law or regulation, either substantive or procedural." 2013 Consent Decree, ¶17.

86.     The Consent Decree was entered by court order on April 3, 2013 and includes a provision that the Decree "shall terminate no later than 10 years after entry of

the decree, subject to the right of the parties to negotiate an extension." 2013 Consent

Decree, ¶11.

87.    The parties have not extended the Consent Decree.

88.    The Consent Decree no longer holds valid legal effect.

### C.  The Tenth Circuit rejected BLM's authority to remove wild horses from public lands based on private landowner requests or Consent Decrees.

89.    In 2013, BLM removed wild horses from the Adobe Town and Salt Wells

Creek HMAs in order to comply with 2013 Consent Decree. BLM removed a total of 668

wild horses and subsequently returned 82 to non-Checkerboard public lands to elevate the

wild horse population up to the lower limit of the AML.

90.    Despite removing hundreds of wild horses, RSGA objected to any wild horses

on the Checkerboard, in either public or private sections. RSGA argued that the 2013

Consent Decree required BLM to remove all wild horses from the Checkerboard lands.

91.    In 2014, BLM removed another 1,263 wild horses from public and private

portions of the Checkerboard within the Great Divide Basin, Adobe Town, and Salt Wells

Creek HMAs. BLM justified removing wild horses from public lands as being necessary to

discharge its duties to remove wild horses from private lands under Section 4 of the WHBA

and to comply with the 2013 Consent Decree.

92.    This decision to remove wild horses from private and public portions of the

Checkerboard was challenged in 2015. *See Am. Wild Horse Preservation Campaign v. Jewell*,

2015 U.S. Dist. LEXIS 179234 (D. Wyo. Mar. 3, 2015).

93.    On October 24, 2016, the Tenth Circuit Court of Appeals held that difficulties

associated with managing wild horses on Checkerboard lands "do not provide BLM with

the authority to construe the [WHBA] in a manner contrary to its plain and unambiguous

terms[,]" and that "BLM violated the duties that [the WHBA] clearly imposes on it with respect to wild horses found on the public land . . ." *Am. Wild Horse Preservation Campaign v. Jewell*, 847 F.3d 1174, 1188-89 (10th Cir. 2016).

94.     The Tenth Circuit explained that, "[i]t is simply improper for BLM to construe the unambiguous terms 'privately owned land' and 'private lands,' as used in Section 4 of the Act, to include the public land sections of the Checkerboard. And, in turn, it was improper for BLM to conduct what it described as a Section 4 gather on the public land sections of the Checkerboard. By doing so, BLM violated the duties that Section 3 clearly imposes on it with respect to wild horses found on the public land sections of the Checkerboard." *Id.* at 1189.

95.     The Tenth Circuit also found that BLM "never explain[ed] how . . . consent decrees can override the clear and unambiguous language of Sections 3 and 4 of the [WHBA]." *Id.*

### D. BLM's Environmental Review and Wild Horse Resource Management Plan Amendment

96.     In January 2020, BLM made available a preliminary Environmental Impact Statement (EIS) for the proposed RMP Amendment for wild horse management in the Rock Springs and Rawlins Field Offices.

97.     The purpose driving the RMP Amendment was RSGA's withdrawal of consent to maintain wild horses on *privately* controlled land, the 2013 Consent Decree, and difficulties managing wild horses in the Checkerboard.

98.     The RMP was not aimed at protecting wild horses as components of the public lands or managing them in a manner that is designed to achieve and maintain a thriving natural ecological balance.

99.     Under the preferred alternative, and all action alternatives in the Preliminary EIS, BLM would stop managing for wild horses in portions, or all, of public lands in the Checkerboard in an effort to reduce difficulties with managing wild horses or reduce conflicts on *private* land.

100.     However, the RMP only covers management of *public* land.

101.     BLM identified Alternative A, which was the "No Action" alternative in which the current management system would remain in place and the multiple HMAs would be managed with a cumulative AML of 1,481 to 2,065 wild horses.

102.     Under the No Action Alternative the HMAs would have the following AMLs as laid out in existing RMPs: 165-235 wild horses in the Rock Springs Field Office portion of the Adobe Town HMA, 445-565 wild horses in the Rawlins Field Office portion of the Adobe Town HMA, 415-600 wild horses in the Great Divide Basin HMA, 251-365 wild horses in the Salt Wells Creek HMA, and 205-300 wild horses in the White Mountain HMA.

103.     In Alternative B, the number of horses would remain the same in the Great Divide Basin and Salt Wells Creek HMAs, with the boundaries adjusted to exclude Checkerboard lands. The Adobe Town HMA AML would be reduced to 225-450 wild horses. All Checkerboard lands in the Adobe Town, Great Divide Basin and Salt Wells Creek HMAs would revert to HA status and be managed for zero horses. Livestock grazing permits would be reduced in the Great Divide Basin and Salt Wells Creek HMAs by 6,876 AUMs and wild horses would be concentrated in a smaller area.

104.     In Alternative C, BLM would remove all wild horses from the Checkerboard lands, and the HMAs would revert to HA status and be managed for zero horses. Under Alternative C, all wild horses would be eliminated from the Checkerboard lands.

21

105.    In Alternative D, the proposed action, the Rock Springs Field Office portion of the Adobe Town HMA would be converted to an HA and managed for zero horses. The portions of the Adobe Town HMA managed by Rawlins Field Office in the Checkerboard would change to HA status and be managed for zero horses, while the remaining portions of the public land in the HMA would be managed with an AML of only 259-536 wild horses.

106.    Under Alternative D, the entire Great Divide Basin HMA would revert to HA status and be managed for zero wild horses.

107.    Under Alternative D, the entire Salt Wells Creek HMA would revert to HA status and be managed for zero wild horses.

108.    Under Alternative D in the preliminary EIS, the White Mountain HMA would revert to HA status and be managed for zero wild horses.

109.    Friends of Animals submitted a timely comment on April 30, 2020.

110.    In its comment, Friends of Animals explained that there was not an overpopulation of wild horses in the proposed project area and that BLM failed to determine that the wild horses to be removed were "excess."

111.    Friends of Animals commented that the plan proposed by BLM violated the WHBA by calling for the elimination of wild horses across public lands without determinations that an overpopulation of wild horses exists or that action must be taken to remove excess wild horses.

112.    Friends of Animals commented that BLM failed to consider wild horses as part of a thriving ecological balance, and instead emphasized the interests of the private landowners and the livestock industry.

113.    Friends of Animals commented that BLM was failing to consider its obligations under NEPA by not identifying and disclosing all foreseeable impacts of the proposed action, including those that are direct, indirect, and cumulative.

114.    Friends of Animals commented that the EA failed to take "a hard look" at the impacts of reducing AMLs and managing for zero wild horses in the planning area, as is required under NEPA.

115.    In particular, the EA failed to consider the positive impacts wild horses have on the ecology of the range and how the removal of wild horses will impact other resources.

116.    BLM failed to disclose how forage previously allocated to wild horses would be reallocated.

117.    BLM failed to take a hard look at how reallocating such forage to other uses, such as livestock grazing, would impact the environment.

118.    Friends of Animals and others commented that BLM should consider reasonable alternatives including: protecting wild horses on the public land portion of the planning area and managing for a thriving natural ecological balance; reducing or eliminating livestock grazing on areas of public land where wild horses were found at the time of the passage of the WHBA; and buying or consolidating private lands in order to create combined and more manageable property parcels.

119.    On May 6, 2022, BLM made available the Proposed RMP and Final EIS for public review along with a notification of a 30-day protest period.

120.    In the Final EIS, BLM made minimal changes from the draft EIS and did not consider in detail the alternatives suggested by Friends of Animals and others.

121.     In the Final EIS, the only change to Alternative D was that the White Mountain HMA would be retained and managed for an AML of 205–300 wild horses. The herd would not be managed as a non-reproducing herd, but population growth suppression would be implemented.

122.     Under Alternative D in the Final EIS, BLM would reduce the total AML for the HMAs by approximately 69% and reduce the acreage of the HMAs in the planning area by approximately 74%.

123.     On June 6, 2022, Friends of Animals submitted its timely protest to the Notice of Proposed RMP Amendment and Final EIS. Friends of Animals noted in its protest that the RMP Amendment violates NEPA, the WHBA, and the Unlawful Inclosures Act by removing federally protected wild horses from public lands to satisfy the private interests of the RSGA.

124.     On December 16, 2022, BLM notified Friends of Animals that the timely submitted protest had been rejected.

125.     BLM did not make any adjustments to the Final EIS or proposed RMP Amendment based on Friends of Animals' protests, or any of the other protests it received.

126.     On May 9, 2023, BLM issued its Record of Decision approving the RMP Amendment.

127.     The RMP Amendment approved by BLM through the Decision adopted Alternative D from the Final EIS in its entirety.

128.     The RMP Amendment calls for the eradication of all wild horse populations from public lands in the Great Divide Basin HMA, the Salt Wells Creek HMA, the Rock

Springs Field office portion of the Adobe Town HMA, and the Checkerboard lands in the Rawlins Field Office portion of the Adobe Town HMA.

129.    The Decision would cause the elimination of wild horses from over one million acres of public lands, including approximately 790,800 acres of public lands outside the Checkerboard land configuration.

130.    The RMP Amendment reduces the AML for the Rawlins Field office portion of the Adobe Town HMA from 610-800 wild horses to 259-536 wild horses. Under the RMP Amendment, wild horses will only be allowed on public lands in portions of the HMA that are outside of the Checkerboard. Those portions that are inside the Checkerboard will be converted to HA status and managed for zero wild horses.

131.    BLM approved the RMP Amendment to address purported difficulties in managing wild horse populations on the Checkerboard and to implement what BLM believed was required by the terms of the 2013 Consent Decree.

132.    The RMP Amendment adopted actions that the 2013 Consent Decree only stated BLM would consider, including changing the Salt Wells Creek and Great Divide Basin HMAs to Herd Areas managed for zero wild horses, and lowering the Adobe Town AML.

133.    The RMP Amendment exclusively covers management of public land in southwestern Wyoming and not the management of private lands.

134.    The RMP Amendment calls for the eradication and reduction of federally protected wild horse populations from public lands in order to prevent wild horses from entering private land.

135.    The RMP Amendment is not based on the need to preserve or maintain a thriving natural ecological balance in the Adobe Town, Great Divide Basin, Salt Wells Creek, and White Mountain HMAs.

136.    While the RMP Amendment calls for eradication and reduction of wild horse populations, there is no correlating reduction in livestock grazing on public lands.

137.    BLM started a separate Rock Springs RMP Revision process, which is still ongoing at the time the complaint was filed.

138.    BLM did not consider management of wild horses in conjunction with the ongoing Rock Springs RMP revision or consider wild horses comparably with other resource values in the formation of the RMP amendment.

139.    BLM did not sufficiently consider reasonable alternatives to the selected RMP Amendment, such as protecting wild horses on the public land portion of the planning area and managing for a thriving natural ecological balance, decreasing or eliminating livestock grazing on public lands where wild horses were found at the time of the passage of the WHBA to reduce conflicts and benefit the environment, and buying or consolidating private lands in order to create combined and more manageable property parcels, rather than the checkerboard configuration.

140.    Instead, BLM chose to remove wild horses from over one million acres of public land under the guise of implementing the terms of the Consent Decree and making its management obligations for private lands easier.

## CLAIMS

### FIRST CAUSE OF ACTION
**(Violation of WHBA and the APA: Defendants' RMP Amendment Improperly Manages Wild Horse Populations for Zero Wild Horses and Eliminates Wild Horses From Public Lands to Benefit Private Interests)**

141.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

142.    On the above facts and legal obligations, Defendants violated the WHBA by approving an RMP Amendment that calls for the eradication of federally protected wild horses from *public* lands and reduces the appropriate management levels on *public* lands based on factors unrelated to achieving or maintaining a thriving natural ecological balance on public lands.

143.    The Decision violates BLM's obligations to consider wild horses as an "integral part of the natural system of public lands" and to protect and manage wild horses as self-sustaining populations of healthy animals.

144.    Defendants violated the WHBA by issuing a Decision to establish appropriate management levels and zero out wild horses on public lands based upon the interest of private landowners, alleged management difficulties, the 2013 Consent Decree, and a desire to prevent wild horses from straying onto private lands.

145.    The Decision is arbitrary and capricious, an abuse of discretion, not in accordance with law or required procedure, in excess of statutory jurisdiction, authority, or limitations, short of statutory right, without observance of procedure required by law, and should therefore be vacated. 5 U.S.C. § 706.

## SECOND CAUSE OF ACTION
### (Violation of NEPA: Defendants Failed to Consider Reasonable Alternatives)

146.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

147.    On the above facts and legal obligations, Defendants violated NEPA by failing to consider a reasonable range of alternatives, including: protecting wild horses on the public land portion of the planning area and managing for a thriving natural ecological balance; decreasing or eliminating livestock grazing on public lands where wild horses were found at the time of the passage of the WHBA; and buying or consolidating private lands in order to create combined and more manageable property parcels, rather than the Checkerboard configuration.

148.    Defendants' Decision is arbitrary and capricious, an abuse of discretion, not in accordance with law or required procedure, in excess of statutory jurisdiction, authority, or limitations, short of statutory right, without observance of procedure required by law, and should therefore be vacated. 5 U.S.C. § 706.

## THIRD CAUSE OF ACTION
### (Violation of NEPA: Defendants Failed to Take a Hard Look at the Impacts of Proposed Actions)

149.    Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

150.    On the above facts and legal obligations, Defendants violated NEPA by failing to independently and adequately analyze the direct, indirect, cumulative, and site-specific effects of managing for zero wild horses and reducing the appropriate management level of wild horses on areas of public lands where wild horses are protected under the WHBA.

28

151.    Defendants did not take a hard look at the direct, indirect, connected and cumulative effects of the Decision, including the genetic and social impacts on wild horses; the positive impacts wild horses have on the ecosystem and how that will be damaged if horses are removed; the negative impact of reallocating forage from wild horses to other uses, such as grazing private domestic cattle and sheep; and the socioeconomic impact of depriving the public of the right to view wild horses on over 1.2 million acres of public lands.

152.    Defendants also failed to provide a full and fair discussion of the significant environmental impacts of the RMP Amendment.

153.    Defendants' Decision is arbitrary and capricious, an abuse of discretion, not in accordance with law or required procedure, in excess of statutory jurisdiction, authority, or limitations, short of statutory right, without observance of procedure required by law, and should therefore be vacated. 5 U.S.C. § 706.

## REQUEST FOR RELIEF

Friends of Animals respectfully requests that this Court enter judgment providing the following relief:

A.    Declare that Defendants' RMP Amendment violates the WHBA and the APA;

B.    Declare that Defendants' Record of Decision and associated RMP Amendment and EIS violated NEPA and the APA;

C.    Enjoin any action previously authorized by the Decision at issue in this case unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

D.    Set aside and remand back to Defendants the RMP Amendment, Record of Decision, and Environmental Impact Statement;

E.    Award Friends of Animals' reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to

Justice Act, 28 U.S.C. § 2412, *et seq.*, and/or all other applicable authorities; and/or

F.     Grant such further relief as the Court deems just and equitable.

Dated: July 3, 2023                                    Respectfully Submitted,

/s/ Brittany Thorpe
Brittany Thorpe
Wyo Bar No. 7-6490
Domonkos & Thorpe, LLC
1914 Logan Ave.
Cheyenne, WY 82001
Telephone: (307) 426-5015
brittany@dandt.llc

Jennifer Best (*pro hac vice pending*)
Friends of Animals, Wildlife Law Program
7500 E. Arapahoe Road, Suite 385
Centennial, CO 80112
Telephone: (720) 949-7791
jennifer@friendsofanimals.org

Rob Huss (*pro hac vice pending)*
Friends of Animals, Wildlife Law Program
7500 E. Arapahoe Road, Suite 385
Centennial, CO 80112
Telephone: (720) 949-7791
rhuss@friendsofanimals.org